**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Charles Lamont Miller,   Case No. C-1-02-554

    Plaintiff

vs

Joe Sprague, et al.,   **REPORT AND RECOMMENDATION**

    Defendants   (Dlott, J.; Hogan, M.J.)

    Plaintiff, an inmate at the Chatham County Detention Center in Cowder City, Georgia, brings this civil rights action under 42 U.S.C. § 1983. Defendants are Joe Sprague and Tim Hubbard of the Aberdeen, Ohio police department. Plaintiff alleges that in April 2002, defendants illegally stopped and detained him on the basis of his race in Aberdeen, Ohio. He alleges that defendants used racial slurs against him, used excessive force in arresting him, denied him medical care, and denied him access to legal papers resulting in the dismissal of pending lawsuits. This matter is before the Court on defendants' motion for summary judgment (Doc. 19), plaintiff's response thereto (Doc. 28), defendants' reply memorandum (Doc. 31), and plaintiff's supplemental response in opposition to the motion for summary judgment. (Doc. 34).

    A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action.

*Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield,* 295 F.3d at 615; *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

Summary judgment "will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *Little Caesar*, 219 F.3d at 551.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**FACTS**

Plaintiff submits the following version of events by way of his affidavit: Plaintiff, an African American male, states he is a self-employed talent scout with a business in Hollywood, California. On April 27, 2002, at approximately 11:15 a.m., he was driving a white Firebird convertible with California license plates from Huntington, West Virginia to Cincinnati, Ohio. While traveling west on U.S. Route 52 through Aberdeen, Ohio, he stopped for approximately 10 minutes at the Integra

Bank in Aberdeen.

As he approached the entrance to the bank, a young, white male was exiting the bank. Plaintiff asked the young man if he had ever done any modeling or acting and asked the man to wait for him until he completed his banking business. The young man agreed to wait. Plaintiff entered the bank and inquired about checking and savings accounts. He then left the bank to speak with the young man. Since plaintiff did not have any business cards on his person, he retrieved a business card from the trunk of his car and handed it to the young man. Plaintiff then left the bank's parking lot and drove away.

Plaintiff subsequently stopped at a gas station to place a phone call. He observed Officer Hubbard's cruiser in the gas station lot. When plaintiff resumed driving, Officer Hubbard followed him for approximately one mile before turning on his police lights. Plaintiff promptly stopped. Plaintiff states he was not speeding, but was nervous because he knew he was wanted on an outstanding warrant for a parole violation in California.

Approximately fifteen minutes later, Chief Sprague arrived on the scene and approached plaintiff's car. About thirty minutes later, plaintiff was placed in Officer Hubbard's police cruiser. Plaintiff does not state any facts concerning the events or conversation that transpired between Chief Sprague's arrival and plaintiff's placement in Officer Hubbard's police cruiser.

Plaintiff states that the windows of the police cruiser were closed. After thirty minutes in the cruiser, plaintiff experienced an asthma attack. He pounded on the windows with his hands in an attempt to summon help from the police officers. He then kicked the window a few times with his feet. Defendants opened the cruiser door, grabbed plaintiff by the feet, and pulled him out of the car, causing plaintiff to strike his head on the ground. Plaintiff states the defendants proceeding to kick and hit him, calling him "nigger." He was then "hog" tied with handcuffs, shackles and "a dog leash" and placed back in the police cruiser. Plaintiff states the defendants laughed at him, called him a "nigger," and said he looked like a slave.

Plaintiff states he never received his asthma inhaler or medical treatment. He states he finally received his asthma inhaler approximately one week after his arrival at the Brown County Jail.

Plaintiff also states that he informed the defendants that he needed legal documents in his briefcase in his car. He states his request was ignored and he was prevented from "representing myself pro se on lawsuits which were dismissed in [sic] the result." (Doc. 28, Miller Aff.).

Defendants present their version of events through the affidavit of Joe Sprague, the Chief of Police for the City of Aberdeen, Ohio. Chief Sprague's conversation with plaintiff concerning his activities at the bank were recorded by Sprague. Defendants submit a tape of the recording and a transcription thereof. (Doc. 19, Exhs. A, B).

Chief Sprague states that on April 27, 2002, he responded to a report of suspicious activity at the Integra Bank in Aberdeen. Upon his arrival, he was informed by bank employees and a bank customer that a newer white car had been in the parking lot with two males. The employees advised Chief Sprague that one of the males came into the bank, inquired about a checking account and then left the bank. After the first male left the bank, the other male came into the bank and also inquired about a checking account. The second male then left the bank and went to the parking lot where both males got into the trunk of the white car. One of the bank's customers provided Chief Sprague with a California license plate number for the car. Chief Sprague surveyed the area surrounding the bank, but did not see the vehicle matching the description given by the bank employees and customer.

At or around 12:10 p.m., Chief Sprague observed a young male matching the description of one of the reported men walking along U.S. 52 approximately two miles from the bank. He stopped the man and confirmed his presence at the bank earlier in the day. The juvenile male informed Chief Sprague that as he was leaving the bank, he was stopped by a man in a white car who said he was a modeling/talent scout. The man asked the juvenile to wait for him until he came out of the bank, whereupon he asked the juvenile for his phone number. The juvenile declined to give the man his phone number and informed the man he would call him. With that said, the man opened the trunk of the car and gave the juvenile a business card. Shortly thereafter, the man in the white car left. The juvenile informed Chief Sprague he was suspicious of the man's inquiry, and took down the license number of the white car. The juvenile gave Chief Sprague a slip of paper with the license number, which matched the license number provided by the bank's customer.

Chief Sprague states, "Based on my reasonable suspicion of criminal activity, I dispatched a call to all patrolmen to look for the suspect's white car." (Doc. 19,

Sprague Aff. ¶13).

Sprague states that shortly thereafter, Officer Hubbard radioed that he was following the suspect's vehicle westbound on U.S. 52. Sprague directed Hubbard to stop the vehicle. Sprague proceeded to Hubbard's location and approached the vehicle. A black male stuck his head out of the driver's door window and demanded to know why he was stopped and claimed he was being racially profiled. Sprague states he made several attempts to explain to plaintiff why he had been stopped, but plaintiff continued to interrupt, arguing he was being racially profiled. Sprague explained to plaintiff that he was investigating his presence at Integra Bank. Sprague advised plaintiff that the bank had been robbed just the other day and that bank employees were suspicious of the activities of the man and juvenile who entered the bank. Sprague advised plaintiff that a female employee of the bank "was in tears" and "scared" given the previous bank robbery and what she perceived to be suspicious activity of the young man and the plaintiff. Sprague also told plaintiff that "we don't get a lot of talent scouts through Aberdeen, Ohio" and that the juvenile thought it "weird" that the man wanted to take pictures of him. Sprague also advised plaintiff that the kid was "upset, scared" and wrote down his licence plate number. Plaintiff denied being at any bank. Sprague advised him that two separate people wrote down his license plate number and placed him at the bank that day. Plaintiff then stated he misunderstood Sprague's question and admitted he had been at Integra Bank that day. Sprague states that the sudden change in plaintiff's story raised Sprague's suspicions.

Sprague performed a search on the Social Security number provided by plaintiff on the patrol car computer. However, the search returned no information. Sprague then performed a criminal history check using the name "Charles Lamont Miller" and the date of birth of February 2, 1967. The check revealed a lengthy history, including prior drug and sex charges. The search revealed Charles Lamont Miller had outstanding warrants in California, Florida and Ohio. When asked, plaintiff denied ever being arrested in California or ever being in the State of Florida. Sprague states, "Based [on] the conflict between Mr. Miller's criminal record and outstanding warrants and the information he provided to me, I called a K-9 unit to the scene to search plaintiff's car. While the K-9 unit searched the car, plaintiff was placed in the back seat of a police car. The K-9 unit "alerted" to plaintiff's car. A second K-9 unit arrived and also "alerted" to plaintiff's car. While the K-9 units were searching the car, a teletype confirmation was received from California which stated they wanted to extradite Mr. Miller back to California for violating his parole.

5

Plaintiff was then placed in handcuffs and placed back in the car. Sprague states that plaintiff "became extremely irate and made repeated threats that he would sue." (Doc. 19, Sprague Aff. ¶47). A search of plaintiff's vehicle revealed a Social Security number that did not match the number provided by plaintiff, but did match the Social Security number on the outstanding warrant in California. The search also uncovered a list of approximately 40 names with Social Security numbers and dates of birth, pornographic materials, cameras, a VCR, a computer, and a citation for Charles Lamont Miller alleging interference with custody of a juvenile in Columbus, Ohio.

During the search, plaintiff "became more enraged and began kicking at the window in the police car." (Doc. 19, Sprague Aff. ¶49). After officers warned plaintiff to stop kicking the window, he was restrained with leg irons and tethers between the handcuffs and leg irons. Plaintiff was transported to the Brown County Jail where a search revealed two bags of marijuana stuffed down his pants. Plaintiff was charged with falsification and drug abuse in Brown County, but the charges were later dropped so he could be extradited to California.

Plaintiff's car was towed and stored at Meadow's Garage. Several items in the car were secured at the Aberdeen Police Department for safekeeping, while other items remained in the secured and locked car.

**Whether defendants are entitled to qualified immunity on plaintiff's Fourth Amendment Terry stop claim.**

Government officials, including prison officials, "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Black v. Parke*, 4 F.3d 442, 444 (6th Cir. 1993), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity not only insulates government officials from individual liability for money damages, but from the burdens and expenses of litigation and trial. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001).

Once a defendant raises a qualified immunity defense, the plaintiff must satisfy a three pronged analysis. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Williams*

*v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc). First, the Court must determine whether the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred. *Id. See Saucier,* 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. Second, the Court determines whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Id.; Feathers*, 319 F.3d at 848; *Williams*, 186 F.3d at 691. Third, the Court must examine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848; *Williams*, 186 F.3d at 691.

A constitutional right is "clearly established," thereby precluding the application of qualified immunity, if "the law [is] clear in regard to the official's particular actions in the particular situation." *Black*, 4 F.3d at 445, quoting *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir.), *cert. denied*, 112 S.Ct. 187 (1991). *See also Ward v. Dyke*, 58 F.3d 271, 273 (6th Cir.), *cert. denied*, 116 S.Ct. 524 (1995). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." *Saucier,* 533 U.S. at 201. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202, quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Id.*

Following the three-step procedure for determining qualified immunity, the Court must first address whether, viewing the facts in the light most favorable to plaintiff, the initial investigative stop of plaintiff's vehicle was constitutionally valid under the Fourth Amendment. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). It is settled that police officers may stop a motor vehicle without a warrant for investigative purposes where the officers have a reasonable suspicion, based on articulable facts, that a person has committed or is about to commit a crime. *See Terry v. Ohio*, 392 U.S. 1 (1968). *See also Florida v. Royer*, 460 U.S. 491, 498 (1983). Such a stop is permissible only when the officers are aware of particularized and articulable objective facts which, when taken together with rational inferences drawn therefrom, reasonably warrant the suspicion that the

7

person stopped is engaged in criminal activity or that criminal activity "'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989), quoting *Terry*, 392 U.S. at 30. *See also Arvizu,* 534 U.S. at 273; *United States v. Cortez*, 449 U.S. 411, 417-418 (1981); *Adams v. Williams*, 407 U.S. 143, 145 (1972); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998)(en banc), *cert. denied*, 525 U.S. 1123 (1999).

"'Reasonable suspicion' is more than an ill-defined hunch; it must be based upon 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999), citing *Cortez*, 449 U.S. at 417-18. Reasonable suspicion is less than that required for probable cause, but there must be at least a "minimal level of objective justification" for making the stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Houston*, 174 F.3d at 813. Reviewing courts should not, however, "demand scientific certainty" from law enforcement officers. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Rather, a reasonable suspicion determination "must be based on commonsense judgments and inferences about human behavior." *Id*. Thus, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274; *Wardlow*, 528 U.S. at 123. While the concept of "reasonable suspicion" is not a "finely tuned standard," *Cortez*, 449 U.S. at 417, the Supreme Court has identified several factors which may amount to reasonable suspicion under the circumstances: specialized knowledge and investigative inferences, *Cortez*, *supra*; personal observation of suspicious behavior, *Terry*, *supra*; and information from sources unknown to police as corroborated by independent police work. *Alabama v. White*, 496 U.S. 325, 332 (1990).

Whether there is reasonable suspicion under *Terry* depends on the totality of the circumstances. *See United States v. Cortez*, 449 U.S. at 417; *Erwin*, 155 F.3d at 822. "This means that a court 'must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003), quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). The totality of the circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arivuz,* 534 U.S. at 273, quoting *Cortez*, 449 U.S. at 418. Hence, the Court must give "due weight" to the factual inferences drawn by local law enforcement officers when reviewing the officer's reasonable suspicion determination.

8

*Id*. Additionally, the "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. The totality of the circumstances, whether innocent or not, must indicate that criminal activity may be afoot. *Id*.

In the instant case, the facts viewed in the light most favorable to plaintiff and in their totality show that defendants had reasonable suspicion to stop plaintiff's vehicle in order to verify or dispel their suspicions that criminal activity may be afoot. The following facts, while seemingly innocent when viewed in isolation, when taken together provided Chief Sprague and Officer Hubbard reasonable suspicion to stop plaintiff's vehicle. Integra Bank had recently been robbed. Bank employees were visibly upset when they reported what they viewed as suspicious activity, undoubtedly viewed in light of the previous robbery: a juvenile's entrance into the bank and inquiry about a checking account, followed immediately by plaintiff's entrance of the bank and inquiry about a checking account. The employees then observed plaintiff and the juvenile conferring at the open trunk of plaintiff's automobile bearing California license plates. While these facts appear innocent when considered separately, they must be considered along with the additional information Chief Sprague obtained from the juvenile. The juvenile reported an out-of-state "talent scout" who wanted to take pictures of him and who wanted his phone number. The juvenile was suspicious of plaintiff's inquiries and took down plaintiff's license plate number. This license plate number matched the license plate number provided to Sprague by the bank customer earlier in the day. Only when Chief Sprague obtained further information from the juvenile did the chief dispatch a call to his patrolmen to look for plaintiff's car to conduct an investigatory stop. Chief Sprague knew the following facts when the dispatch call was made: a stranger driving a car bearing out-of-state license plates and representing himself as a "talent scout" had solicited a juvenile he just met in a parking lot for pictures, without parental permission. This activity could reasonably raise a suspicion that criminal activity involving a minor may be afoot. These facts, taken as a whole, created a particularized and objective basis for an investigatory stop of plaintiff's vehicle. The Court finds the stop reasonable under *Terry* and its progeny and therefore reasonable within the meaning of the Fourth Amendment.

Having concluded that defendants had a reasonable suspicion to initially stop plaintiff's car, the Court must determine whether defendants had sufficient reasonable suspicion to detain plaintiff after the purposes of the traffic stop had been accomplished. *U.S. v. Bailey*, 302 F.3d 652, 657 (6th Cir. 2002). "[A]ny subsequent detention after the initial stop must not be excessively intrusive in that the officer's

9

actions must be reasonably related in scope to circumstances justifying the initial interference." *Id.*, citations omitted. "Once the purposes of the initial traffic stop [are] completed, there is no doubt that the officer [can] not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *Id.* at 657-58, quoting *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995). *See also U.S. v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998) (en banc), *cert. denied*, 525 U.S. 1123 (1999).

In the instant case, defendants had a reasonable suspicion based on the totality of the circumstances to detain plaintiff. Plaintiff admitted he was nervous because he knew he was wanted on an outstanding warrant for a parole violation in California. *Erwin*, 155 F.3d at 822. Plaintiff's behavior upon questioning by Chief Sprague also reasonably raised Sprague's suspicions justifying further detention. Plaintiff was extremely argumentative and repeatedly interrupted Chief Sprague as Sprague attempted to explain the reasons for the initial stop. Plaintiff gave conflicting stories concerning his whereabouts, first denying he was at Integra Bank, and then admitting he was there after being told two people had recorded his license plate number. While a search of the Social Security number provided by plaintiff yielded no information, a search using plaintiff's name and date of birth revealed a criminal history of prior drug and sex charges and outstanding warrants in California, Ohio and Florida. When informed of this information, plaintiff denied even being arrested in California (although he admits in his affidavit he knew at the time he was wanted on an outstanding warrant in California) or ever being in the State of Florida. At this point, Sprague's continuing suspicion of criminal activity was clearly justified.

Based on the conflicting information from plaintiff and the information from the criminal record search, Sprague called for a K-9 unit to search plaintiff's car. Two separate K-9 units alerted to plaintiff's car. Once the drug-sniffing dogs arrived and alerted to plaintiff's car, it is clear that Chief Sprague had probable cause to search the car. *See Bailey*, 302 F.3d at 659 n.7, citing *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994) ("A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." (citation omitted).

During the search by the dog units, a teletype confirmation was received from California with a request to extradite plaintiff back to California for violating his parole. At this point, plaintiff was placed in handcuffs and placed back in the cruiser. A search of plaintiff's vehicle revealed a Social Security number that did not match

the number provided by plaintiff, but did match the Social Security number on the outstanding warrant in California. The search also uncovered a list of approximately 40 names with Social Security numbers and dates of birth, pornographic materials, cameras, a VCR, a computer, and a citation for Charles Lamont Miller alleging interference with custody of a juvenile in Columbus, Ohio. In addition, two bags of marijuana were found on plaintiff when he was searched at the Brown County Jail. In view of the totality of the circumstances, defendants had reasonable suspicion to detain plaintiff following the initial *Terry* stop, and probable cause to arrest him based on the subsequent information obtained during the investigative stop. *See United States v. Dotson*, 49 F.3d 227, 230 (6th Cir.), *cert. denied*, 516 U.S. 848 (1995) (probable cause to arrest exists if "at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."), quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

In view of the above facts, plaintiff has failed to establish a violation of his Fourth Amendment rights. Because plaintiff failed to satisfy the first prong of the qualified immunity analysis, the Court need not address whether the right was clearly established. *See Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003). Accordingly, defendants' motion for summary judgment should be granted on plaintiff's Fourth Amendment claims.

**Whether defendants are entitled to qualified immunity on plaintiff's equal protection claim.**

The fact that the Court finds no Fourth Amendment violation in this case does not foreclose plaintiff's Fourteenth Amendment Equal Protection claim. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002). Plaintiff claims he was stopped by defendants because of his race, African-American. However, plaintiff fails to present any evidence showing racial profiling in this matter.[1] It is clear that "the Constitution [Equal Protection Clause] prohibits selective enforcement of the law based considerations such as race." *Whren v. United States*,

---

[1] To the extent plaintiff's affidavit contains statements indicating that racial slurs and statements were made by defendants during their alleged use of force against him, this evidence shall be addressed in plaintiff's excessive use of force claim below.

517 U.S. 806, 813 (1996). The targeting of a criminal suspect solely by reference to his race violates the constitution. *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). To establish his equal protection claim for racial profiling, plaintiff must show by "direct, circumstantial, or statistical evidence, that he was a target of racial profiling." *United States v. Saucedo*, 226 F.3d 782, 790 (6th Cir. 2000), *cert. denied*, 531 U.S. 1102 (2001). Mere speculation that defendants selected plaintiff for a traffic stop because of racial bias is inadequate to support a racial profiling charge. *Id*. Moreover, the selection of an African-American suspect for questioning "because his clothing, appearance, location, and race coincided with published descriptions" patently does not comprise "illegal 'racial targeting' or 'racial profiling.'" *United States v. Waldon*, 206 F.3d 597, 604 (6th Cir. 2000).

Plaintiff submits no evidence indicating that Chief Sprague's decision to stop his vehicle was based on racial considerations, rather than the reported information from the Integra Bank employees and customers, and the juvenile solicited by plaintiff for pictures. Neither plaintiff's affidavit, nor the tape recording of the traffic stop, indicates any racial slurs or other evidence supporting a claim that plaintiff was the target of racial profiling. *See Saucedo*, 226 F.3d at 790. Therefore, defendants' motion for summary judgment on plaintiff's equal protection claim should be granted.

**Whether defendants are entitled to qualified immunity on plaintiff's excessive use of force claim.**

Claims alleging the use of excessive force during the process of an arrest are analyzed under the Fourth Amendment's "objective reasonableness" test. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1050 (6th Cir.1994). This test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "reasonableness" of an officer's use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

Viewing the evidence in the light most favorable to the plaintiff, *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998), the issue of the reasonableness of defendants' use of force is an issue of fact which precludes summary judgment for defendants on the excessive force claim. Here, plaintiff's affidavit states that while

in the police cruiser, he experienced an asthma attack and attempted to summon help from defendants by pounding and kicking the window. At this point, he avers that defendants opened the door, grabbed him by his feet, and pulled him out of the cruiser, causing his head to strike the ground. Plaintiff's affidavit states that defendants proceeded to kick and hit him, calling him "nigger" in the process. He states he was "hog tied" and called a "slave" and placed back in the cruiser. Defendants dispute using any racial slurs against plaintiff and assert that plaintiff was secured with leg irons and tethers to protects plaintiff's own safety, as well as the safety and property of the officers.

For purposes of summary judgment, the Court must accept the plaintiff's version of events as true, and must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251-52. In this case, plaintiff's affidavit indicates that defendants kicked and hit him after he was already handcuffed and on the pavement. He further states that defendants used racial slurs in the process. Plaintiff's facts, if true, would indicate that the force used exceeded that reasonably necessary to accomplish the arrest and to secure plaintiff and the area. The Court notes that the credibility of plaintiff's statements is an issue for the jury, and a jury certainly would be entitled to credit that testimony. The Court cannot assume that a jury would disbelieve plaintiff unless his testimony is so unbelievable or so discounted by other evidence that a reasonable jury could not believe it. The Court does not find other evidence creating that result. Although defendants contend the audio tape shows no racial slurs or statements were made by the defendants, the Court notes the audio tape terminates prior to alleged confrontation at issue. Where plaintiff's affidavit is based on first hand knowledge and states facts creating a claim of excessive force, the Court may not resolve the case by finding one witness more credible than another. *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998). The facts viewed in the light most favorable to the plaintiff show defendants use of force against him was excessive and that a constitutional violation has occurred. *Saucier,* 533 U.S. at 201.

In terms of the second prong of the qualified immunity analysis, whether the violation involved a clearly established constitutional right of which a reasonable person would have known, *Feathers*, 319 F.3d at 848; *Williams*, 186 F.3d at 691, it is well established that an individual has a constitutional right not to be subjected to excessive force during the course of an arrest. *See, e.g., Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994).

13

Third, plaintiff has offered sufficient evidence showing that defendants' alleged use of force was objectively unreasonable in light of the clearly established constitutional rights. *Feathers*, 319 F.3d at 848; *Williams*, 186 F.3d at 691. A reasonable officer would not believe that kicking and hitting a handcuffed suspect after taking the subject to the ground is an objectively reasonable use of force. Therefore, defendants are not entitled to qualified immunity on plaintiff's excessive force claim.

Defendants ignore plaintiff's statements that he was kicked and hit after being taken to the pavement and that such actions were accompanied by racial slurs. While the use of handcuffs, leg irons, and tethers may have been necessary to secure plaintiff and to prevent him from harming himself and others in light of his behavior inside the cruiser, the use of such devices is wholly separate from the central allegations of plaintiff's excessive force claim. Moreover, defendants' Eighth Amendment analysis set forth in their reply brief is simply inapplicable to the instant case. (Doc. 31 at 7-10). The Eighth Amendment is not implicated by alleged misconduct that occurs prior to conviction. *See Bass v. Robinson*, 167 F.3d 1041, 1048-49 (6th Cir. 1999), citing *Ingraham v. Wright,* 430 U.S. 651, 671 n. 40 (1977).

For these reasons, defendants are not entitled to qualified immunity on plaintiff's excessive use of force claim. Accordingly, their motion for summary judgment on this claim should be denied.

**Whether defendants are entitled to qualified immunity on plaintiff's denial of medical care claim.**

Plaintiff's denial of medical care claim is premised on the Fourteenth Amendment due process right not to be punished while in pretrial detention. The Sixth Circuit has determined that the Eighth Amendment cruel and unusual punishment analysis used by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976), is applicable to pretrial detainees. *Danese v. Asman*, 875 F.2d 1239, 1243 (6th Cir. 1989), *cert. denied*, 494 U.S. 1027 (1990), citing *Roberts v. City of Troy*, 773 F.2d 720, 722 (6th Cir. 1985). To prevail on his denial of medical care claim, plaintiff must show that defendants displayed a deliberate indifference to his serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive

risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *see also Williams v. Mehra,* 186 F.3d 685, 691-92 (6th Cir. 1999) (en banc). Thus, the deliberate indifference analysis has both an objective element–was the deprivation sufficiently serious? –and a subjective element– did the official act with a sufficiently culpable state of mind? *Durham v. Nu'Man,* 97 F.3d 862, 869 (6th Cir. 1996), *cert. denied,* 520 U.S. 1157 (1997). A prison official acts with deliberate indifference when "he acts with criminal recklessness," a state of mind that requires that the official act with conscious disregard of a substantial risk of serious harm. *See Farmer,* 511 U.S. at 837.

Moreover, in a case such as this where delay in medical treatment is at issue, the Court ascertains the seriousness of the deprivation by examining the effect of the delay. *Napier v. Madison County,* 238 F.3d 739, 742 (6th Cir. 2001). Specifically, "[a detainee] who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay." *Id.* at 742, quoting *Hill v. Dekalb Reg. Youth Detention Ctr.,* 40 F.3d 1176, 1188 (11th Cir. 1994).

In this case, plaintiff has failed to come forward with any "verifying medical evidence," *see Napier,* 238 F.3d at 742, that he suffers from a serious medical condition, asthma, and that defendants' alleged failure to provide him with his asthma inhaler upon request had a detrimental effect on his health. In the absence of such evidence, plaintiff cannot prevail on his Fourteenth Amendment due process claim. Therefore, defendants' motion for summary judgment should be granted with respect to plaintiff's claim that defendants delayed providing him medical treatment in violation of his rights under the Fourteenth Amendment.

**Whether defendants are entitled to qualified immunity on plaintiff's denial of access to the courts claim.**

In order to establish his claim of denial of access to the courts, plaintiff must present evidence showing he was actually impeded in an existing or contemplated non-frivolous legal proceeding. *Lewis v. Casey,* 518 U.S. 343, 351-53 (1996); *Hadix v. Johnson,* 182 F.3d 400, 406 (6th Cir. 1999). To have standing to pursue an access-to-the-courts claim, plaintiff must "show actual prejudice to non-frivolous claims."

*Hadix*, 182 F.3d at 406.

Here, plaintiff states he informed the defendants that he needed legal documents located in the briefcase in his car. He states his request was ignored and he was prevented from "representing myself pro se on lawsuits which were dismissed in [sic] the result." (Doc. 28, Miller Aff.). However, plaintiff presents no evidence whatsoever showing he was actually impeded in any particular lawsuit or that he was harmed in some other way by the missing documents. He fails to provide evidence of specific dates as to when his documents were due or how he was unable to replicate the allegedly confiscated documents. Nor does plaintiff offer any evidence showing his lawsuits were "non-frivolous" as required under *Hadix*. Plaintiff's conclusory allegations are insufficient to establish his claim for denial of access to the courts under § 1983. Therefore, defendants' motion for summary judgment should be granted on this claim.

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendants' motion for summary judgment be **GRANTED** on plaintiff's Fourth Amendment *Terry* stop, equal protection, denial of medical care, and denial of access to the courts claims.

2. Defendants' motion for summary judgment be **DENIED** on plaintiff's excessive use of force claim.


Date: 10/29/2003
          s/Timothy S. Hogan
          Timothy S. Hogan
          United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

P:\TSH\Law Clerks\02-554R&R.wpdkl